UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 19 CR 864 |
| v. | Hon. Thomas M. Durkin |
| RISHI SHAH, SHRADHA AGARWAL, and BRAD PURDY | United States District Judge |

### MOTION FOR *DAUBERT* HEARING AND TO EXCLUDE OR LIMIT PROPOSED EXPERT WITNESS TESTIMONY

The UNITED STATES OF AMERICA, by MATTHEW MADDEN, Attorney for the United States Acting Under Authority Conferred by 28 U.S.C. § 515, and LORINDA LARYEA, Acting Chief of the Fraud Section of the Criminal Division, U.S. Department of Justice, respectfully submits this motion for a *Daubert* hearing and to exclude or limit the proposed testimony of defendants' proffered expert witnesses, Dr. Thomas Lys, Dr. Karl Muth, and Mr. Chris Yeh.

Respectfully submitted,

MATTHEW F. MADDEN
Attorney for the United States Acting under Authority Conferred by 28 U.S.C. § 515

By:  *s/ Saurish Appleby-Bhattacharjee*
Matthew F. Madden
Saurish Appleby-Bhattacharjee
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 469–6045

LORINDA LARYEA
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:    *s/ William E. Johnston*
William E. Johnston
Kyle C. Hankey
Assistant Chiefs
1400 New York Ave NW
Dated: August 29, 2022       Washington, D.C. 20530

TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND .................................................................................................. 2

    A. Charges .................................................................................................... 2

    B. Defendants' Expert Disclosures ............................................................. 3

        1. Disclosures for Dr. Thomas Lys ...................................................... 4

        2. Disclosures for Dr. Karl Muth ......................................................... 5

        3. Disclosures for Chris Yeh ................................................................. 5

III. LEGAL STANDARD ........................................................................................... 6

IV. ARGUMENT ....................................................................................................... 8

    A. The Court Should Exclude or Limit the Proposed Testimony of Dr. Thomas Lys, Which Provides Misleading Characterizations Regarding an Auditor's Function, and Includes Improper Topics That Are Not Suitable for Expert Testimony .................................................................................................. 8

        1. A *Daubert* hearing is necessary to determine whether Dr. Lys's characterization of an auditor's function is based on a reliable methodology .. 9

        2. Dr. Lys's proposed testimony shifting blame to Deloitte, a victim of defendant's alleged fraud, should be excluded or limited under Seventh Circuit law. ........................................................................................................... 14

        3. Dr. Lys should not be permitted to opine about defendants' mental state under Rule 704(b) ............................................................................................ 16

    B. The Court Should Exclude the Proposed Testimony of Dr. Karl Muth, Which Is Not Based on a Reliable Methodology According to Defendants' Disclosures and Will Not Help the Jury. ................................................................................ 19

        1. A *Daubert* hearing is necessary to determine whether Dr. Muth's testimony is based on a reliable methodology ................................................................ 20

        2. Dr. Muth's testimony about start-ups should be excluded as irrelevant.. 22

    C. The Court Should Exclude the Proposed Testimony of Chris Yeh, Which Is Not Based on a Reliable Methodology According to Defendants' Disclosures and Will Not Help the Jury, and Limit Mr. Yeh's Open-Ended Testimony on As-Yet Undisclosed Topics. ................................................................................... 25

        1. A *Daubert* hearing is necessary to determine whether Mr. Yeh's testimony is based on a reliable methodology ................................................................ 26

        2. Mr. Yeh's proposed testimony is not helpful to the jury. ......................... 28

        3. Mr. Yeh's testimony cannot go beyond defendants' disclosures. .............. 33

V. CONCLUSION .................................................................................................. 34

i

TABLE OF AUTHORITIES

CASES

*Bielskis v. Louisville Ladder, Inc.,*
    663 F.3d 887 (7th Cir. 2011) ............................................................... 20, 27

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ........................................................................ *passim*

*Florek v. Village of Mundelein, Ill.,*
    649 F.3d 594 (7th Cir. 2011) ............................................................... 23, 28

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ................................................................................. 7

*Hartman v. EBSCO Indus., Inc.,*
    758 F.3d 810 (7th Cir. 2014) ..................................................................... 6

*Higgins v. Koch Dev. Corp.,*
    794 F.3d 697 (7th Cir. 2015) ..................................................................... 7

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) ............................................................................. 6, 7

*Lapsley v. Xtek, Inc.,*
    689 F.3d 802 (7th Cir. 2012) ..................................................................... 6

*Lewis v. CITGO Petroleum Corp.,*
    561 F.3d 698 (7th Cir. 2009) ..................................................................... 7

*Morley v. Square,* 2016 WL 1728367,
    (E.D. Mo. April 29, 2016) ....................................................................... 32

*O'Conner v. Commonwealth Edison Co.,*
    13 F.3d 1090 (7th Cir. 1994) ................................................................... 12

*Riggs Partners, LLC v. Hub Group, Inc.,*
    2002 WL 31415721 (N.D. Ill. Oct. 25, 2002) ............................................. 9

*Smith v. Ford Motor Co.,*
    215 F.3d 713 (7th Cir. 2000) ................................................................... 34

*Switzer v. Dillman Eye Care Assoc.,*
    2021 WL 6144073 (C.D. Ill. June 14, 2021) ............................................... 12

CASES (CONT'D)

*Timm v. Goodyear Dunlop Tires North America, Ltd.*,
    932 F.3d 986 (7th Cir. 2019) ........................................................................... 21

*United States v. Boros*,
    668 F.3d 901 (7th Cir. 2012) ............................................................................ 8

*United States v. Brown*,
    871 F.3d 532 (7th Cir. 2017) ......................................................... 16, 17, 18

*United States v. Brunt*,
    No. 07 CR 753 (N.D. Ill.) ................................................................................ 15

*United States v. Caputo*,
    382 F. Supp. 2d 1045 (N.D. Ill. 2005) ........................................................ 16, 17

*United States v. Coffman*,
    94 F.3d 330 (7th Cir. 1996) ......................................................................... 14, 15

*United States v. DiCosola*,
    No. 12 CR 446 (N.D. Ill.) ................................................................................ 14

*United States v. Freed*,
    No. 13 CR 951 (N.D. Ill.) ................................................................................ 15

*United States v. Hall*,
    93 F.3d 1337 (7th Cir. 1996) ............................................................................ 7

*United States v. Hall*,
    165 F.3d 1095 (7th Cir. 1999) ..................................................................... 23, 28

*United States v. Laguna*,
    693 F.3d 727 (7th Cir. 2012) ....................................................................... 30, 33

*United States v. Letorneau*,
    2013 WL 3834410 (N.D. Ill. July 24, 2013) ............................................... 14

*United States v. O'Brien*,
    No. 17 CR 239 (N.D. Ill.) ................................................................................ 14

*United States v. Ogoke*,
    No. 13 CR 105 (N.D. Ill.) ................................................................................ 15

*United States v. Perez*,
    86 F.3d 735 (7th Cir. 1996) ....................................................................... 30, 31

CASES (CONT'D)

*United States v. Serfling,*
  504 F.3d 672 (7th Cir. 2007) ............................................................ *passim*

*United States v. Thomas,*
  377 F.3d 232 (2d Cir. 2004) ..................................................................... 15

*United States v. Truitt,*
  938 F.3d 885 (7th Cir. 2019) ................................................................... 16

*United States v. Williams,*
  2022 WL 2132327 (E.D. La. June 14, 2022) ........................................... 18

RULES

Fed. R. Evid. 403 ................................................................................... 7, 8

Fed. R. Evid. 702 ............................................................................ *passim*

Fed. R. Evid. 704(b) ................................................................. 16, 17, 18, 19, 29

Fed. R. Crim. P. 16 ................................................................. 3, 8, 14, 20, 33

## I.    INTRODUCTION

The allegations in this case are rather simple. Defendants Rishi Shah, Shradha Agarwal, and Brad Purdy are accused of defrauding various victims through material misstatements or omissions. Although the trial in this case is expected to take several months, during which numerous witnesses will describe defendants' respective roles at their company, Outcome Health, and their representations to third parties, at the trial's conclusion, the jury will be asked to resolve a straightforward question: did defendants knowingly participate in a scheme to defraud, or not? In answering that question, the jury will be instructed by this Court on the applicable law and called upon to exercise its common sense in determining defendants' guilt. In that sense, this case is like any other fraud case tried within the Northern District of Illinois.

Defendants have notified the government of three expert witnesses they intend to call at trial: Dr. Thomas Lys, Dr. Karl Muth, and Chris Yeh. Through the proffered opinions of these witnesses, defendants aim—alternatively—to distract the jury with testimony that will not aid its determination of material questions of fact, or to deprive the jury of its factfinding function. Based on their written disclosures to date, defendants have so far failed to establish that their experts' opinions are the product of a reliable methodology. Accordingly, in exercising its gatekeeping function, this Court should conduct a *Daubert* hearing and assess whether the testimony of these proffered experts is admissible under Federal Rule of Evidence 702. The Court should also exclude, or limit, various categories of proposed testimony that—as detailed below—are not helpful to the jury and intrude upon the jury's responsibility of determining whether defendants acted knowingly and with the intent to defraud.

## II. BACKGROUND

### A. Charges

The charges here arise out of defendants' scheme to defraud clients, lenders, investors, and auditors of their company, Outcome Health ("Outcome"), from around 2011 until 2017. As the superseding indictment alleges, "Outcome placed television screens, tablets, and wallboards that displayed educational content in doctor's offices and then sold advertising space on those devices to pharma clients and other clients," a process dubbed "'point-of-care' advertising." R. 14. Further, defendants are accused of engaging in a scheme to defraud by: (a) falsely representing to Outcome's clients that Outcome had in its network specific doctors and doctor's offices that the clients were targeting for advertising; (b) lying to clients about how many screens the clients' advertisements were running on; (c) falsely inflating patient engagement metrics associated with Outcome tablets; (d) causing material under-delivery on Outcome's advertising campaigns with its clients; (e) causing clients to pay for advertising that was not delivered; (f) causing the material inflation of revenue in Outcome's financial statements; and (g) using Outcome's inflated financial statements to obtain a $110 million loan in April 2016, a $375 million loan in December 2016, and $487.5 million in equity financing in 2017. *Id.* The superseding indictment alleges, moreover, that defendants engaged in various acts to conceal their scheme to defraud, including—as pertinent here—hiding the under-delivery on advertising campaigns from Outcome's

outside auditor, Deloitte & Touche LLP ("Deloitte")[1] through the submission of false financial statements. *Id.*

In the superseding indictment, defendants Rishi Shah, Shradha Agarwal, and Brad Purdy are each charged with six counts of mail fraud (Counts One, Two, Four, Eleven, Twenty-Three, and Twenty-Five) and two counts of bank fraud (Counts Nine and Thirteen). *Id.* Shah is charged with twelve counts of wire fraud (Counts Five, Fourteen through Twenty-Two, Twenty-Four, and Twenty-Six). *Id.* Agarwal is charged with eight counts of wire fraud (Counts Fifteen through Eighteen, Twenty, Twenty-Two, Twenty-Four, and Twenty-Six), and Purdy is charged with seven counts of wire fraud (Counts Three, Seven, Fourteen, Twenty-One, Twenty-Two, Twenty-Four, and Twenty-Six). Shah is also charged with two counts of money laundering (Counts Ten and Twelve) and Purdy is charged with one count of making a false statement to a bank (Count Eight). *Id.* Ashik Desai, charged with one count of wire fraud (Count Six), pleaded guilty pursuant to a written plea agreement, R. 48, and is expected to testify as a government witness at trial.

### B.    Defendants' Expert Disclosures

On December 1, 2021, defendants provided their disclosures pursuant to Rule 16(b)(1)(C) concerning the expert testimony of: (i) Dr. Thomas Lys, an accounting professor at Northwestern University's Kellogg School of Management; (ii) Dr. Karl Muth, a professor of entrepreneurship at the Chicago Booth School of Business; and

---

[1] Deloitte is referred to as Auditor A in the indictment. R. 14 at 3. Deloitte audited Outcome's 2015 and 2016 financial statements. *Id.*

(iii) Chris Yeh, an "entrepreneur, investor, author, and educator." Exs. 1–3. On January 31, 2022, the government issued a request for more detailed disclosures regarding each witness's proposed testimony, qualifications, and methodology. Ex. 4. And on March 11, 2022, defendants responded with additional disclosures. Exs. 5–7.

### 1.    Disclosures for Dr. Thomas Lys

Dr. Lys's proposed testimony concerns work performed for Outcome during the periods relevant to the indictment by its outside auditor, Deloitte. According to their disclosures, defendants propose having Dr. Lys testify that it "was reasonable for defendants to rely on [Deloitte] to ensure that Outcome recognized revenue in accordance with GAAP [Generally Accepted Accounting Principles] and that Outcome's financial statements were otherwise free from material misstatements." Ex. 1 at 3. Attempting to shift blame to Deloitte for failing to uncover the ongoing fraud at Outcome—which was itself furthered by defendants' false statements and submission of false financial statements and records to Deloitte—defendants expect Dr. Lys will opine that Deloitte's "conclusions about Outcome's revenue recognition were inconsistent with GAAP." *Id.* Lastly, defendants propose having Dr. Lys define an auditor's responsibility of exercising "professional skepticism," before opining that Deloitte "relied on audit procedures and evidence that did not provide an adequate basis to support its conclusions on Outcome's revenue recognition" and that Deloitte's "investigation of whistleblower claims at Outcome was insufficient." *Id.*; *see also* Ex. 5 at 6–10.

### 2. Disclosures for Dr. Karl Muth

According to defendant's disclosures for Dr. Muth, his opinions can be grouped into three categories: (1) the typical lifecycle of startups and threats to startups' survival; (2) governance, managerial, and operational issues peculiar to startups; and (3) valuation and negotiation of venture financing. *See* Exs. 2, 6. In the first category, according to defendants, "Dr. Muth is expected to testify about the life cycle of start-ups to provide context for the development of Outcome Health[.]" Ex. 2 at 2. In the second category, "Dr. Muth will apply organizational behavior and risk management theories to discuss the different stages of start-ups and the challenges typically faced at these different stages." *Id.* at 3. In the third category, "Dr. Muth is also expected to describe his examination of available documents, including financial documents, and to describe how an investor might value a company based on these documents, either in the diligence context or on an ongoing basis." *Id.* at 4.

### 3. Disclosures for Chris Yeh

Defendants' disclosures concerning Mr. Yeh's testimony preview his opinions that "Outcome was a company that underwent rapid, 'blitzscaling'-style growth, and faced many of the operational and other challenges that are common to blitzscaling companies." Ex. 7 at 2. Defendants define "blitzscaling" as growing a start-up by "prioritizing speed over efficiency, even in an environment of uncertainty." Ex. 3 at 2. Specific "challenges" identified by defendants include operational scalability; difficulty in applying traditional management techniques; handling communications; maintaining culture; "transplant rejection"; delegation to subordinates; distinguishing subordinates' mistakes from problematic activities; adoption of

mature-company processes and strategies; and reliable forecasting and planning. Defendants assert that Mr. Yeh's testimony will "give the jury context to assess Outcome's management, operations, and performance issues," and "help the jury determine whether defendants' action were competent, negligent, or criminal in light of the challenges of blitzscaling." Ex. 7 at 3.

## III.  LEGAL STANDARD

Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), governs the admissibility of expert opinion testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). The purpose of the *Daubert* inquiry is to scrutinize whether proposed expert-witness testimony has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152). In evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the Court considers whether the proffered expert: (1) is qualified; (2) has employed a reliable methodology; (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications; and (4) presents testimony on a matter that is relevant to the case at hand. *See Kumho Tire*, 526 U.S. at 151–53; *Daubert*, 509 U.S. at 589–93; *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014) ("The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue.").

The party seeking to introduce expert testimony bears the burden of showing that it meets the applicable standards. *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). Trial courts are obligated to act as gatekeepers to ensure that the "proposed expert testimony is both relevant and reliable." *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015); *see also Kumho Tire Co., Ltd.*, 526 U.S. at 147–49; *Daubert*, 509 U.S. at 589.

To determine reliability, the proponent must show that the expert's testimony is based on "sufficient facts or data," that it is "the product of reliable principles and methods," and that those methods have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The proffered opinion must be informed by the witness's expertise, rather than simply constitute an opinion offered by a purported expert. *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Fed. R. Evid. 403." *Hall*, 93 F.3d at 1343.

Even where evidence is otherwise admissible under Rule 702 and *Daubert*, the Court may exclude it under Federal Rule of Evidence 403, which "permits a district court to 'exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence.'" *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (alteration in original) (quoting Fed. R. Evid. 403). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

## IV. ARGUMENT

### A. The Court Should Exclude or Limit the Proposed Testimony of Dr. Thomas Lys, Which Provides Misleading Characterizations Regarding an Auditor's Function, and Includes Improper Topics That Are Not Suitable for Expert Testimony.

As phrased in defendants' original and supplemental Rule 16 disclosures, Dr. Lys's proposed testimony suffers from several defects, which require its exclusion or, at a minimum, that it be limited. At the outset, Dr. Lys's proffered opinions regarding the role of an auditor—generally, and as applied to Deloitte—fail to consider material provisions of Generally Accepted Accounting Standards, while squarely contradicting others. And defendants' disclosures have not established that Dr. Lys's opinions are the product of a reliable methodology. The Court should therefore conduct a *Daubert* hearing to determine whether Dr. Lys's testimony is admissible under Rule 702.

What's more, at its core, Dr. Lys's proposed testimony shifts the blame to Deloitte—an alleged victim of defendants' fraudulent scheme—for its failure to detect that fraud through its own alleged negligence. Well-settled Seventh Circuit precedent forecloses such evidence, whether presented as expert testimony or otherwise. Dr. Lys also purports to opine about whether defendants "reasonably relied" on Deloitte's

auditing functions. Yet such opinion testimony would squarely implicate defendants' *mens rea*, and is therefore inadmissible under Rule 704(b).

Accordingly, and for the reasons below, the Court should exclude or limit Dr. Lys's proposed testimony, subject to a *Daubert* hearing.

1. **A *Daubert* hearing is necessary to determine whether Dr. Lys's characterization of an auditor's function is based on a reliable methodology.**

Dr. Lys's proposed expert testimony relies on two sets of standards governing the preparation and auditing of financial statements: Generally Accepted Accounting Principles and Generally Accepted Auditing Standards, which are defined as follows: "Generally accepted accounting principles ('GAAP') comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles establish guidelines for measuring, recording and classifying the transactions of a business entity. Generally accepted auditing standards ('GAAS') embody the general standards for the conduct of auditors in the performance of an examination." *Riggs Partners, LLC v. Hub Group, Inc.*, 2002 WL 31415721, at *3 n.4 (N.D. Ill. Oct. 25, 2002) (citation omitted; cleaned up).[2]

According to defendants' disclosures, Dr. Lys—purporting to rely on GAAP and GAAS—is expected to testify that Deloitte's function as an auditor was to "ensure that Outcome recognized revenue in accordance with GAAP and that Outcome's

---

[2] Here, defendants' disclosures for Dr. Lys cite GAAP provisions published in the Accounting Standards Codification ("ASC") issued by the Financial Accounting Standards Board ("FASB"), and GAAS provisions published in the Clarified Codification of Statements of Auditing Standards ("AU-C") issued by the Auditing Standards Board ("ASB"). *See* Exs. 1 and 5. Relevant AU-C provisions are appended to this motion as Exhibits 9 and 10.

financial statements were otherwise free from material misstatements." Ex. 1 at 3; Ex. 5 at 2. As phrased, this proffered opinion raises material concerns as to Dr. Lys's methodology, and whether it reliably applies the same GAAP and GAAS standards he purports to have reviewed, for three reasons.

*First*, under GAAS, "[t]he financial statements subject to audit are those of the entity, prepared and presented by management of the entity with oversight from those charged with governance." AU-C § 200.05.[3] Further, "an audit in accordance with GAAS is conducted on the premise that management and, when appropriate, those charged with governance have acknowledged certain responsibilities that are fundamental to the conduct of the audit." *Id.* In pertinent part, these include the responsibilities to: (1) prepare and fairly present financial statements in accordance with "the applicable financial reporting framework"; and (2) design, implement, and maintain "internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error[.]" AU-C § 200.14. In their engagement letters with Deloitte, and consistent with the above GAAS provisions, Outcome's management—specifically including the defendants, who each signed the letters—represented that: (1) "to the best of [their] knowledge and belief," the "financial statements" the company submitted to Deloitte for its review "are fairly presented in conformity with GAAP"; and (2) defendants had "no knowledge of any allegations of fraud or suspected fraud affecting the Company's

---

[3] According to defendants, in forming his opinions, Dr. Lys reviewed and relied upon AU-C Section 200, which is enclosed as Exhibit 9. *See* Ex. 5 at 12.

financial statements communicated by employees, former employees, regulators, or others." Ex. 10 [*under seal*] at 1–2, 7.[4]

Against this backdrop, Dr. Lys's opinions that it "is customary for executives to rely on a company's auditor to ensure that a company's financial reports are complaint with [GAAP]," and, by extension, that Deloitte was itself responsible for "ensur[ing] that Outcome recognized revenue in accordance with GAAP and that Outcome's financial statements were otherwise free from material misstatements" appears inconsistent with the GAAS principles cited in the remainder of defendants' expert disclosures. According to GAAS, *management* bears the responsibility for the preparation and fair presentation of financial statements. In fact, a GAAS-compliant audit requires management to acknowledge that very responsibility. AU-C §§ 200.05, 200.14. A *Daubert* hearing is therefore warranted to further assess whether Dr. Lys's proffered opinions regarding what is "customary" regarding the responsibilities of a company's executives and its outside auditor is the product of a reliable methodology.

*Second*, "GAAS require the auditor to obtain *reasonable assurance* about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error." AU-C § 200.06 (emphasis added). This standard is defined as:

> [A] high, but not absolute, level of assurance. . . . Reasonable assurance is not an absolute level of assurance because there are inherent limitations of an audit that result in most of the audit evidence, on which the auditor draws conclusions and bases the auditor's opinion, being persuasive rather than conclusive.

---

[4] According to defendants, in forming his opinions, Dr. Lys reviewed and relied upon Deloitte's March 23, 2016 engagement letter, which is enclosed as Ex. 10. *See* Ex. 5 at 14.

AU-C § 200.06. Consistent with the above standards, Deloitte—in its audit reports to Outcome—noted that its obligation was to "plan and perform the audit to obtain reasonable assurance about whether the combined financial statements [of Outcome] are free of material misstatement," while relying on management's acknowledgement of its own responsibilities in Deloitte's engagement letter. Ex. 11 [*under seal*] at 1.

Despite these express GAAS provisions—which he admits having reviewed in forming his opinions (*see* Ex. 5 at 12)—Dr. Lys is expected to opine that Deloitte was required to "*ensure* that Outcome recognized revenue in accordance with GAAP and that Outcome's financial statements were otherwise free from material misstatements." Ex. 1 at 3; Ex. 5 at 2 (emphasis added). The word "ensure" does not appear anywhere in the above GAAS provisions. And in everyday usage, "ensure" means "to make sure, certain, or safe," or to "guarantee." *Ensure*, MERRIAM-WEBSTER DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/ensure (last accessed Aug. 26, 2022). Here again, Dr. Lys's proffered opinions appear to be facially inconsistent with GAAS, and a *Daubert* hearing is required to determine whether Dr. Lys's use of the term "ensure" to describe an auditor's responsibility with respect to a company's financial statements is the product of a reliable methodology. *See Switzer v. Dillman Eye Care Assoc.*, 2021 WL 6144073, at *9 (C.D. Ill. June 14, 2021) ("An expert's opinions must be 'supported by the authors on which he claims to rely.'") (quoting *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1107 (7th Cir. 1994)).

Lastly, Dr. Lys's proposed opinions belabor the notion that an "auditor should plan and perform an audit with professional skepticism," defined as "[a]n attitude

that includes a questioning mind, being alert to conditions that may indicate possible misstatement due to fraud or error, and a critical assessment of audit evidence." Ex. 5 at 7 (quoting AU-C §§ 200.14 and 200.17)). According to defendant's disclosures, Dr. Lys is expected to testify that Deloitte "displayed a lack of professional skepticism by relying on procedures and evidence which did not form an adequate basis for its conclusions," and by failing to adequately investigate whistleblower claims at Outcome. *Id.* at 7, 9. Yet under GAAS, "[u]nless the auditor has reason to believe the contrary, the auditor may accept records and documents as genuine." AU-C § 240.13.[5] And here, the indictment alleges that defendants concealed the extent of Outcome's under-delivery from Deloitte through submission of falsified financial statements. Put differently, Deloitte itself is named as one of the victims of the alleged scheme to defraud—one that was deliberately misled by the company it was hired to audit. R. 14 at 3, 7–8, 10–17, 25.

Even GAAS principles recognize that "audit procedures used to gather audit evidence may be ineffective for detecting an intentional misstatement that involves, for example, collusion to falsify documentation that may cause the auditor to believe that audit evidence is valid when it is not. The auditor is neither trained as nor expected to be an expert in the authentication of documents." AU-C § 200.A51. While "deny[ing] that they concealed under-delivery from and otherwise misled [Deloitte]," defendants' disclosure for Dr. Lys contends that they were "victims of a massive fraud

---

[5] According to defendants, in forming his opinions, Dr. Lys reviewed and relied upon AU-C Section 240, which is enclosed as Ex. 9. *See* Ex. 5 at 12.

perpetrated by Ashik Desai and his subordinates, who concealed the extent of under-delivery from Defendants and from [Deloitte]." Ex. 5 at 2. Yet nowhere in defendants' Rule 16 disclosures does it appear that Dr. Lys considered what impact—if any—deliberately falsified financial statements would have on Deloitte's ordinary exercise of "professional skepticism," particularly given defendants' representations in their engagement letters that they were unaware "of any allegations of fraud or suspected fraud affecting the Company's financial statements[.]" Ex. 10 [*under seal*] at 2. Such a critical omission, given defendants' concession that financial statements submitted by Outcome to Deloitte were materially false, further calls into question the reliability of Dr. Lys's methodology and opinions regarding Deloitte's exercise of "professional skepticism" in accordance with GAAS.

In short, Dr. Lys's proposed testimony, which alternatively fails to consider or is outright contradicted by GAAS principles, is not—given defendant's disclosures to date—based on a reliable methodology. A *Daubert* hearing is therefore necessary.

### 2. Dr. Lys's proposed testimony shifting blame to Deloitte, a victim of defendant's alleged fraud, should be excluded or limited under Seventh Circuit law.

"The Seventh Circuit has repeatedly held that 'the perpetrator of a fraud may not defend himself by blaming the victim[.]" *United States v. Letorneau*, 2013 WL 3834410, at *3 (N.D. Ill. July 24, 2013) (citing *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007); *United States v. Coffman*, 94 F.3d 330, 333–34 (7th Cir. 1996)).[6]

---

[6] This principle is so well-settled that multiple courts in this district have provided a version of the following instruction in fraud cases: "It is not a defense to fraud to blame the victim of the fraud for being duped or for being negligent." *United States v. DiCosola*, No. 12 CR 446 at Dkt. 226, p. 28; *see also United States v. O'Brien*, No. 17 CR 239 at Dkt. 229, p. 37

Yet that is precisely what defendants attempt to accomplish through the proposed testimony of Dr. Lys, shifting the blame to Deloitte—which was itself deceived by the false statements and materially falsified financial records that it received from Outcome—for failing to uncover defendants' alleged fraud earlier.

In *Serfling*, the defendant was convicted for a wire-fraud scheme that involved procuring a loan through repeated false representations to a lender. 504 F.3d at 674. The district court barred testimony from a banking expert that, "with due diligence, [the lender] would have discovered the fraudulent documentation used to procure the loan." *Id.* at 676. Defendant "hoped that the banking expert would reinforce his theory of defense, which was that the fraud had been executed by [third parties] wholly unbeknownst to [the defendant]"; to that end, the expert "would testify that if [the lender] had engaged in a reasonable investigation, [the defendant] would have been alerted to the attempted fraud in his name before the loan closed." *Id.* The district court excluded the proposed testimony as improper victim-blaming, a decision that the Seventh Circuit affirmed. *Id.* at 679 (citing *Coffman*, 94 F.3d 330, 333–34; *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004)).

As noted previously, the indictment lists Deloitte itself among the victims of defendants' alleged fraudulent scheme. And as in *Serfling*, defendants claim that the fraud had been perpetrated by a third party—Desai—unbeknownst to them, but that

(Durkin, J.) ("It is not a defense to fraud that if the victim had only been more diligent, it might have discovered and prevented the fraud."); *United States v. Freed*, No. 13 CR 951 at Dkt. 124, p. 33 (same instruction in bank-fraud case); *United States v. Ogoke*, No. 13 CR 105 at Dkt. 181, p. 35 (same instruction in wire-fraud case); *United States v. Brunt*, No. 07 CR 753 at Dkt. 410, p. 33 (same instruction in mail- and wire-fraud case).

a "reasonable investigation" by Deloitte would have alerted them to the fraud. Indeed, Dr. Lys's proposed testimony is replete with assertions that Deloitte, not defendants, are at fault for failing to detect the fraud at Outcome earlier, based on what Dr. Lys concludes were inadequate audit procedures or failures to sufficiently investigate whistleblower claims. *Serfling* compels the exclusion of Dr. Lys's opinions to this end, which amount to little else than victim-blaming dressed up as expert testimony.

### 3. Dr. Lys should not be permitted to opine about defendants' mental state under Rule 704(b).

In criminal cases, "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b); *see also United States v. Truitt*, 938 F.3d 885, 887 (7th Cir. 2019) (affirming exclusion of expert's proposed testimony that defendant lacked requisite *mens rea* for charged crime); *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017) (affirming exclusion of proposed expert testimony that would "merely tell the jury what result to reach" (internal quotations and citation omitted)); *United States v. Caputo*, 382 F. Supp. 2d 1045, 1049 (N.D. Ill. 2005) ("An expert witness also cannot offer an opinion that amounts to a legal conclusion, *i.e.*, testimony that does little more than tell the jury what result to reach, because such testimony is not helpful to the jury and because its probative value is substantially outweighed by the danger of unfair prejudice."). Yet Dr. Lys's proposed opinion as to whether defendants reasonably relied on Deloitte to ensure that Outcome's financial statements were accurate violates this cardinal rule.

16

As noted previously, the indictment alleges that defendants' scheme to defraud involved, among other things, materially inflating the revenue in Outcome's financial statements. R.14. In their initial disclosure, defendants stated: "Professor Lys is expected to testify that it would have been reasonable for Purdy (as well as Shah and Agarwal) to rely on [Deloitte] to ensure that [Outcome's] financial reports were compliant with GAAP." Ex. 1 at 3. The government responded that this amounted to "little else than a conclusion about the defendants' state of mind—a matter left solely for the jury" and thus "appears to be facially inadmissible" under Rule 704(b). Ex. 4 at 2. Defendants, in their supplemental disclosure, averred that the government's objection "misapprehends the nature of Professor Ly's expected testimony[.]" Ex. 5 at 2. To that end, they stated: "Professor Lys is expected to testify that it is customary for executives to rely on a company's auditor to ensure that a company's financial reports are compliant with [GAAP]." *Id.* What's more, according to defendants' expert disclosures, "Professor Lys is expected to testify that if in fact Outcome's management did rely on Outcome's auditor, Deloitte and Touche[,] such reliance would have been reasonable given Professor Lys's expertise in the relationship between management and auditors generally." *Id.*

Yet that final step crosses "[t]he line drawn in Rule 704(b)," which "prohibits expert opinion about a criminal defendant's state of mind." *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017). The government expects that it will be undisputed, at trial, that Outcome, in fact, under-delivered on its contracts, and that Outcome, in fact, prepared and submitted materially false financial statements to third parties.

Defendants dispute they were personally aware of the under-deliveries or falsehoods in Outcome's financial statements, instead claiming that Outcome's former employee "Ashik Desai and his subordinates" effectuated the fraud. Ex. 5 at 2. Accordingly, expert testimony regarding defendants' "reasonable" reliance on Deloitte to "ensure" the accuracy of Outcome's financial statements entails rendering an opinion as to whether defendants acted knowingly, or with the intent to defraud—which are "matters . . . for the trier of fact alone." Fed. R. Evid. 704(b); *see also Brown*, 871 F.3d at 539 (affirming exclusion of proposed expert testimony that defendant police officer "acted reasonably under the circumstances" in deprivation-of-rights prosecution); *United States v. Williams*, 2022 WL 2132327, at *7 (E.D. La. June 14, 2022) (holding under Rule 704(b) that defense expert "will not be permitted to draw for the jury the ultimate conclusion—in the case of a defense expert, as here, that the defendants reasonably relied on [their tax preparer]" in tax-fraud case).

Again, *Serfling* proves instructive. There too, the defendant "suggest[ed] that [his banking] expert's testimony was meant to serve [the] purpose of establishing that reasonable action by [the victim lender] would have alerted [the defendant] to a fraud of which he was otherwise completely ignorant." 504 F.3d at 679. While affirming the exclusion of the proposed expert testimony as improper victim-blaming—as discussed above—the Seventh Circuit also concluded that that "the expert's testimony would do little to support [the defendant's] theory that he was wholly unaware of the fraud," because the defendant's "intent is not an appropriate subject for expert testimony," and defendant "does not claim that the expert had personal knowledge regarding

18

what [the defendant] knew, nor when." *Id*. The Seventh Circuit therefore held that "the district court did not abuse its discretion by excluding the expert witness." *Id*.

Put simply, defendants may dispute—as is their right—that they acted knowingly or with intent to defraud. But the jury, and only the jury, is entrusted with resolving that question, without Dr. Lys's improper opinions bearing on defendants' *mens rea*. Under *Serfling* and Rule 704(b), the Court should exclude or limit Dr. Lys's proposed expert testimony regarding whether or not defendants "reasonably relied" on Deloitte.

### B. The Court Should Exclude the Proposed Testimony of Dr. Karl Muth, Which Is Not Based on a Reliable Methodology According to Defendants' Disclosures and Will Not Help the Jury.

Defendants have not met their burden of showing by a preponderance of the evidence that Dr. Muth's testimony is based on a reliable methodology or will be helpful to the jury's determination of a fact at issue. They offer Dr. Muth as an expert in start-up companies and venture financing. While the government does not challenge Dr. Muth's qualifications as to how start-ups operate and are financed, defendants have not demonstrated that his opinions are the result of a reliable methodology applied to the facts of this case. Most of Dr. Muth's proposed testimony concerns how start-up companies in general operate, not how Outcome Health—the company that defendants led—operated. Such generalized opinions have no relevance to the facts the jury will decide. This Court should exclude Dr. Muth's proposed testimony, or, at a minimum, conduct a *Daubert* hearing to determine whether defendants can meet their burden under Rule 702.

### 1. A *Daubert* hearing is necessary to determine whether Dr. Muth's testimony is based on a reliable methodology.

Defendants' disclosures under Federal Rule of Criminal Procedure 16 are insufficient and necessitate a *Daubert* hearing to determine whether Dr. Muth's testimony is the product of a reliable methodology based on sufficient facts. Most of Dr. Muth's opinions are general in nature, aimed at providing "context," and are unmoored from the facts of this case. The handful of Dr. Muth's opinions that directly address Outcome's operations are too vague to determine whether they are based on "sufficient facts or data," and are "the product of reliable principles and methods," or whether Dr. Muth "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

For example, in the second category of opinions, "Dr. Muth is expected to opine that, at Outcome, managerial gaps developed in a variety of areas, including but not limited to the review and oversight of financial documents, the structures and processes for maintaining quality control, the systems for ensuring and organizing compliance with contractual obligations, and day-to-day operational functions." Ex. 6 at 7. Defendants have not described how Dr. Muth applied "organizational behavior and risk management theories" to the facts of this case to make judgments about Outcome's operations. Ex. 2 at 3. Merely because Dr. Muth has experience working in start-ups and teaching a course on start-ups does not mean that his opinion about Outcome's operations is reliable. "An expert's opinion must be reasoned and founded on data. It must also utilize the methods of the relevant discipline[.]." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). Here, based on defendants'

disclosures to date, it is unclear what records from Outcome Dr. Muth reviewed to formulate his opinions. And without a showing "that his conclusions were the fruit of a rigorous, objectively-verifiable approach," based on sufficient data points, this proposed testimony about Outcome's operations is no more than "mere speculation." *Timm v. Goodyear Dunlop Tires North America, Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019).

Similarly, in category three, defendants state that "Dr. Muth will opine on the diligence documents involved in the Outcome capital raise and which aspects of those documents seem typical or unusual in a transaction of this kind." *See* Ex. 2 at 4. In a supplemental disclosure, defendants identified a few documents that Dr. Muth "considers unusual," but declined to specify what, if anything, was unusual about them, and how Dr. Muth came to that opinion as a result of a reliable comparison between the Outcome capital raise and capital raises of a similar size, *i.e.*, over $400 million. Dr. Muth's unfamiliarity with these documents may simply be because he does not have much experience with large venture-capital financings. For instance, defendants note that Dr. Muth's experience as an investor involves personal contributions ranging "from $25,000 to $250,000," and his role as an executive at FRST coincided with raising "$500,000 in convertible debt and, soon thereafter, a $3.4M priced round." Ex. 6 at 12. The size of these investments pale in comparison to those at issue in this case, which are between $25 million and $100 million per investor. A *Daubert* hearing is, accordingly, needed to determine whether Dr. Muth has a reliable methodology and access to sufficient facts to substantiate his opinions.

### 2. Dr. Muth's testimony about start-ups should be excluded as irrelevant.

Dr. Muth's generalized testimony about how start-ups operate and are governed is irrelevant to the jury's determination of whether defendants devised and perpetrated a scheme to defraud their clients, lenders, investors, and auditors while leading Outcome. The jury's determination of guilt will turn on a number of issues, including how defendants sold advertising campaigns to their pharmaceutical clients; how the company invoiced its clients; what the company did when it failed to deliver on its contracts; and defendants' knowledge of these practices. Dr. Muth's proposed testimony has nothing to do with the advertising industry, but concern general principles and observations about business organization and management. As such, it will not enable the jury to better understand the evidence pertaining to any of the issues at the heart of this case.

Even a cursory review of Dr. Muth's opinions bears this out. For example, in category one, defendants proffer, "Dr. Muth is expected to opine that decisions made between two seemingly-similar options in an early-stage start-up can be the difference between success and failure. . . . Dr. Muth is expected to discuss the research in this area and explain what recent research findings suggest." Ex. 2 at 2. In a supplemental disclosure, defendants added, "Dr. Muth is expected to opine that early-stage startups can be organized with a range of different governance capabilities and responsibilities, including many startups which have relatively lean and unsophisticated governance systems that become more sophisticated only as the company matures." Ex. 6 at 2. Generalized testimony about how start-up companies

grow and succeed simply has no bearing on whether defendants participated in a scheme to defraud Outcome's pharmaceutical clients.

Defendants' explanations for the supposed relevance of these opinions fall flat. For example, defendants maintain that Dr. Muth's testimony in category one about "the unique challenges encountered when an organization grows beyond the boundaries of a CEO's personal sphere" will help "explain why Mr. Shah and other executives may have relied heavily on Ashik Desai and others to advise on the operations of Outcome and raise concerns to his attention." Ex. 2 at 2. This, however, is not the type of inference that requires specialized knowledge or understanding. The average layperson understands that the larger the organization, the more tasks the head of that organization has to delegate. *See Florek v. Village of Mundelein, Ill.*, 649 F.3d 594, 602–03 (7th Cir. 2011) ("[W]hen the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."); *United States v. Hall*, 165 F.3d 1095, 1104 (7th Cir. 1999) ("expert testimony will not aid the jury because it addresses an issue of which the jury is already generally aware"). And despite defendants' claims to the contrary, how start-ups *generally* operate is not beyond the ken of the average juror. Most jurors likely have experience in organizations— whether business, political, religious, or charitable—as employees, clients, or volunteers. They can understand how Outcome operated without the aid of an expert's specialized knowledge.

In another instance in category one, defendants maintain that Dr. Muth's testimony about corporate-governance theory "will give the jury relevant context to

assess what roles and responsibilities at Outcome rested with Mr. Shah, and what roles and responsibilities rested instead with the company's board." Ex. 6 at 5. Yet this explanation is devoid of any details regarding how the board's role impacts the defendant's guilt or innocence. Indeed, the company's board is not alleged to have had any role in the scheme to fraud and is mentioned nowhere in the indictment. It is hard to fathom how this specific opinion is relevant to any fact at issue. Accordingly, it should be excluded.

In still another instance in category one, defendants state that Dr. Muth's opinion about how "managerial and strategic approaches to capturing new territory may be different" and "why such firms may tradeoff precision in execution for speed to market" will "provide the jury with relevant context to assess the decision-making, strategies, operations, motivations, and performance of Outcome Health and its executives." Ex. 6 at 6. Such vague and generalized observations about how start-up companies operate, again, do not make any pertinent fact more or less likely to be true. A desire to grow fast may or may not speak to a lack of intent to perpetrate a fraud. As phrased in defendants' disclosures, this opinion is too attenuated from the specific misconduct defendants are alleged to have committed.

Another irrelevant opinion appears in category three, the venture-financing process: "Dr. Muth is also expected to describe his examination of the available documents, including financial documents, and to describe how an investor might value a company based on these documents." Ex. 2 at 4. In their supplemental disclosure, defendants added, "Three of the most typical valuation methodologies in

t[he] context [of venture capital financing] are the Net Asset Value (NAV) framework, the multiples framework, and the Discounted Cash Flow (DCF) framework." Ex. 6 at 8. Whether or not these opinions about how potential investors evaluate start-ups are valid, as phrased, they appear to have no application to how the investors in this case evaluated Outcome. For example, there is no suggestion that the investors in Outcome's 2017 capital raise adopted one valuation method over another and, as a result, the alleged misrepresentations made by the defendants may not have been material. Nor is there any suggestion that some investors placed outsize importance on documents containing no misrepresentations compared against others that did. In other words, these opinions do not make any fact of consequence more or less probable. And while Dr. Muth's proposed opinions may be well-suited to a university course, they have no place in a criminal trial focused on specific misrepresentations made by defendants.

If the Court is disinclined to preclude Dr. Muth's testimony at this stage, a *Daubert* hearing is necessary to further probe his specific opinions, to determine whether they would have any relevance to the facts at issue.

### C. The Court Should Exclude the Proposed Testimony of Chris Yeh, Which Is Not Based on a Reliable Methodology According to Defendants' Disclosures and Will Not Help the Jury, and Limit Mr. Yeh's Open-Ended Testimony on As-Yet Undisclosed Topics.

As to Mr. Yeh, a *Daubert* hearing is necessary because defendants' disclosures do not provide sufficient information for the Court to determine whether Mr. Yeh's testimony is admissible under Rule 702. The government and the Court need more information to determine whether Mr. Yeh's testimony is based on sufficient facts or

data and whether Mr. Yeh has reliably applied some methodology in his field as an expert on "blitzscaling" to the facts of the case.

Second, the disclosures of Mr. Yeh's expected testimony make apparent that it would not be helpful to the jury. His testimony about the challenges faced by *other* rapidly growing companies *besides* Outcome is simply not relevant because it has no probative value to resolving the facts at issue in this case and would merely tend to confuse the issues and distract the jury. Moreover, to the extent that Mr. Yeh intends to testify that defendants' behavior presented at trial can be explained by Outcome's rapid growth as a company, such testimony would address matters on which the jury can reach their own opinions and draw their own conclusion based on their common sense and experience.

Finally, defendants' supplemental disclosure reveals that Mr. Yeh intends to testify on "any witness testimony, facts, or other aspects of the government's case-in-chief that are within Mr. Yeh's field of expertise." Ex. 7 at 2. As the gatekeeper, this Court should not permit such open-ended testimony without first determining—before the jury hearing it—that it is admissible under Rule 702.

### 1. A *Daubert* hearing is necessary to determine whether Mr. Yeh's testimony is based on a reliable methodology.

As noted previously, to pass muster under Rule 702, an expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline." *Bielskis*, 663 F.3d at 894. Defendants have not satisfied their burden of demonstrating that Mr. Yeh's testimony satisfies these threshold requirements.

26

Defendants' disclosures of Mr. Yeh's expected testimony offer several opinions without adequately disclosing the bases and reasons for them as would allow the government or the Court to determine whether such testimony meets the reliability requirement of Rule 702. For instance, when describing Mr. Yeh's opinion that "operational scalability" challenges at Outcome were caused by what he dubs "blitzscaling," defendants assert that "gaps in manpower developed as the number of employees and functions grew," and that "[t]hose gaps included but were not limited to quality control, advertising, internal audit, and risk management." Ex 7 at 4. To the extent that defendants intend to elicit Mr. Yeh's opinion that these "gaps" were actually *caused* by blitzscaling (and not by some other impetus, like defendants' desire to conceal their ongoing fraud), defendants have not explained what, if any, methodology Mr. Yeh applied, or how he would typically assess problems at "blitzscaling" companies to determine that there is a causal link vis-à-vis Outcome's challenges and any effort to blitzscale.

Similarly, Mr. Yeh would apparently opine that Outcome did, in fact, blitzscale. *See, e.g.,* Ex. 7 at 6 ("As a result, blitzscaling companies like Outcome often struggle to maintain their culture as they grow."). Yet nothing in defendants' original or supplemental disclosures explains how Mr. Yeh applied his expertise and the methodologies of his field to the salient facts to draw that conclusion—an important conclusion, assuming Yeh intends to testify that Outcome's challenges were caused by blitzscaling. Without more, defendants fail to meet their burden to establish the reliability of Mr. Yeh's opinion, or the methodologies applied to reach it.

Neither the government nor the Court are in any position to assess the reliability of Mr. Yeh's testimony without first understanding how he applied certain methods commonly used in his field of expertise to the facts at issue in order to reach his opinions about Outcome and its management. A *Daubert* hearing is therefore necessary to discern which documents, data, or witness information Mr. Yeh relied upon, which methods he used to assess that information, and how he applied those methods to the facts to reach his conclusions.

### 2. Mr. Yeh's proposed testimony is not helpful to the jury.

Defendants' disclosures of Mr. Yeh's anticipated testimony make apparent that it would not be helpful to the jury. His testimony is irrelevant, and any probative value is vastly outweighed by the risk of confusing the issues, distracting the jury, and wasting time. To the extent defendants want the jury to consider how the circumstances surrounding Outcome's operations and rapid growth could explain why certain conditions existed and why certain conduct occurred at the company, the jury can use its own common sense and experience to assess the facts and draw reasonable inferences from them. The jury is in no need of a "blitzscaling" expert to help it understand and weigh that type of evidence. *See Florek*, 649 F.3d at 602–03; *Hall*, 165 F.3d at 1104.

When the government asked defendants to explain how Mr. Yeh's testimony would aid the jury in determining any fact at issue at trial, defendants responded simply that "Rule 16 does not require an explanation of the relevance of a particular opinion." Ex. 7 at 4. Setting aside what Rule 16 requires, Federal Rule of Evidence 702 and post-*Daubert* jurisprudence *do* require defendants to establish—in advance

28

of trial—the relevance of their expert witness's opinion testimony. *Daubert*, 509 U.S. at 591-92 ("Expert testimony which does not relate to an issue in the case is not relevant, and, ergo, not helpful."). While defendants did ultimately provide some explanation of their theory of relevance for Mr. Yeh's testimony, those explanations only underscore the irrelevance and unduly prejudicial nature of his opinions.

Much of Mr. Yeh's expected testimony appears to be about how blitzscaling companies *in general* operate and experience challenges because of blitzscaling. Defendants assert that "the relevance of Mr. Yeh's opinions should be self-evident: they will give the jury context to assess Outcome's management, operations, and performance issues and will help the jury determine whether defendants' actions were competent, negligent, or criminal."[7] But, as explained above, generic expert testimony about a certain category of companies, *i.e.*, those involved in "blitzscaling," and the challenges they generally face is simply not relevant to the jury's assessment of defendants' conduct while executives at Outcome.

A review of defendants' disclosures for Mr. Yeh demonstrates why such generalized testimony would be unhelpful to the jury. First, Mr. Yeh is prepared to testify about *why* a generic start-up executive may choose to blitzscale and grow a business quickly. Ex. 7 at 2 (*e.g.,* "Offensively, blitzscaling confers many benefits.

---

[7] Of course, testimony by Mr. Yeh about whether defendants' conduct was "competent, negligent, or criminal," would clearly violate Rule 704(b), which prohibits expert-witness testimony on whether a criminal defendant had the mental state to commit any of the charged offenses. Because it is unclear whether Mr. Yeh intends to testify to this point directly, the government seeks either a clarification from defendants that this is not their intent, or a court order that defendants may not elicit such testimony from Mr. Yeh.

First…"; *and*, "Defensively, blitzscaling creates short- and long-term competitive advantages that can fend off competitors. In many markets…".). Testimony about why any executive—whether a generic one, or a defendant here—would want to grow a business quickly does not tend to prove or disprove any fact at issue at trial. There appears to be no purpose for admitting such testimony beyond attempting to place defendants in a sympathetic light. *See United States v. Laguna*, 693 F.3d 727, 730 (7th Cir. 2012) (district court correctly excluded evidence that risked jury nullification because it was irrelevant and would do nothing more than confuse the jury); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly.").

Defendants also intend to elicit testimony from Mr. Yeh about challenges that blitzscaling companies typically face, and why they face those challenges. Defendants' disclosures consist of pages of proffered testimony unmoored from Outcome altogether. Examples of such generalized testimony include proffered opinions addressing "management challenges" and "management issues (Ex. 7 at 3, 5); "talent acquisition" (*id.* at 3); "organizational churn" (*id.*); lack of termination of managers for "operational issues" (*id.*); reliable "forecasting and planning" (*id.*); and the unremarkable assertion that "mistakes occur" and are expected at blitzscaling companies (*id.* at 4), to name some.

Defendants assert that such testimony will "give the jury a reference as to what decisions and strategies may be *rational* and *typical* for a blitzscaling startup such as

30

Outcome." Ex. 7 at 3 (emphasis added). But expert testimony that does nothing more than attempt to rationalize and normalize illegal conduct is not appropriate—it does not tend to prove or disprove any fact at issue in trial, and it would merely serve to confuse the issues. Simply put, expert testimony about what a generalized category of companies (*i.e.*, companies that "blitzscale") do and experience in their operations is not relevant to determining defendants' guilt or innocence, and would—at best— merely waste time at trial.

Defendants' disclosures do indicate that Mr. Yeh will testify about certain operational and management "challenges" at Outcome, and how those are typical of blitzscaling companies. Examples include "infrastructure scaling" issues (Ex. 7 at 4); "gaps in manpower and managerial oversight" (*id.*); ineffective "communications processes" (*id.* at 6); and challenges in building "a unified culture that has clear values, principles, and attitudes" (*id.*), among others. Defendants apparently seek to elicit this testimony to explain, first, that these issues existed, and, second, to "give the jury context to assess Outcome's management, operations, and performance issues and [] help the jury determine whether defendants' actions were competent, negligent, or criminal." Ex. 7 at 4.

It is one thing for the defendants to introduce percipient testimony about the business environment at Outcome because it is tied to proving or disproving a fact at trial, such as defendants' knowledge or intent. But this testimony is not within the purview of an expert witness, like Mr. Yeh, who did not have personal knowledge of the historical facts. And a jury is well-equipped to use its common sense and

experience to understand whether or not the business environment at Outcome—and certain operational challenges faced by the company—bear upon facts at issue in trial, like defendants' knowledge and intent. *See Morley v. Square*, 2016 WL 1728367, at *2 (E.D. Mo. April 29, 2016) (excluding expert testimony regarding "start-up business norms" because "concepts surrounding human interaction and basic business activity will not be foreign to the jury"). Expert-opinion testimony is not necessary for the jury to understand such evidence and, if warranted, draw inferences regarding *mens rea* or any other element of the charged crimes. And, again, any testimony by Mr. Yeh that defendants did not have the requisite mental state to commit one or more of the charged offenses because their conduct was, instead, either "competent" or merely "negligent" would directly violate Rule 704(b).

It is quite another thing for Mr. Yeh to opine that the business environment at Outcome—and any purported "challenges" that existed in that environment—was shaped by the speed at which the company grew, and that those challenges are expected and normal when compared to other fast-growing companies. The question of "why" Outcome had certain operational challenges simply does not tend to prove or disprove any fact at issue at trial. Neither does the fact that other fast-growing companies apparently suffer similar challenges. And even less relevant is any opinion testimony intended to explain that defendants had valid business reasons to accept the risks of those operational challenges by growing their company as fast as they did. None of this testimony would bear on defendants' guilt or innocence—it would merely attempt to rationalize and normalize the defendants' conduct, distract the

jury, and waste time. Irrelevant evidence that would do nothing more than confuse the jury is inadmissible. *Laguna*, 693 F.3d at 730.

### 3. Mr. Yeh's testimony cannot go beyond defendants' disclosures.

In their supplemental disclosure of Yeh's testimony, defendants assert: "it may be that other topics and examples not detailed here become relevant." Defendants then "expressly reserve the right for Mr. Yeh to respond to or comment upon any witness testimony, facts, or other aspects of the government's case-in-chief that are within Mr. Yeh's field of expertise." Ex. 7 at 2.

According to defendants' disclosures, Mr. Yeh's "field of expertise" is quite broad. *See, e.g.,* Ex 7 at 2 ("Defendants intend to call Chris Yeh as an expert in start-ups, specifically start-ups that 'blitzscale.'"). It appears to be defendants' position that Outcome is a start-up that blitzscaled. It would follow, then, that defendants' view of Mr. Yeh's field of expertise would extend as far as any aspect of Outcome's operations relevant to its status as a start-up. Therefore, defendants appear to reserve the right to have Mr. Yeh testify about a wide scope of topics relevant to Outcome not specifically disclosed to the government.

The government objects to any opinion testimony by Mr. Yeh that extends beyond those topics sufficiently disclosed to the government as required by Rule 16. Without sufficient notice, the government and the Court would have no opportunity to assess the admissibility of such testimony under Rule 702. "[A]s a threshold matter, a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of

33

fact with a fact at issue." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (internal quotes and citation omitted). Given the evidentiary problems with the topics defendants *have* disclosed, the prospect of such open-ended testimony raises even more concerns about the reliability and helpfulness of whatever as-yet undisclosed opinions defendants would choose to elicit from Mr. Yeh.

## V.    CONCLUSION

For these reasons, the government respectfully requests that the Court exclude or limit the proposed testimony of defendants' proffered experts, Dr. Thomas Lys, Dr. Karl Muth, and Chris Yeh. Additionally, the government requests that the Court, in exercising its gatekeeping function, conduct a *Daubert* hearing to assess the proposed expert testimony of these witnesses, including the reliability of their methods and helpfulness to the jury.